ANGELINA CAMARILLO, et al

v

CITY OF NORTH LAS VEGAS, et al

DEFENDANTS' PETITION FOR REMOVAL
UNDER 28 U.S.C. § 1446(a)

EXHIBIT A

Complaint

Pages 1-21

Electronically Filed
5/15/2025 7:46 PM
Steven D. Grierson
CLERK OF THE COURT

# DISTRICT COURT CIVIL COVER SHEET

Clark _____ County, Nevada

Case No. _____
*(Assigned by Clerk's Office)*

## I. Party Information *(provide both home and mailing addresses if different)*

| Plaintiff(s) (name/address/phone): | Defendant(s) (name/address/phone): |
|---|---|
| Angelina Camarillo, Estate of Felicia Guzman | CITY OF NORTH LAS VEGAS; |
| C/o Peter Goldstein | BECKY SALK OR STEIN #025-919142-C |
| | 2250 Las Vegas Blvd. North Department 10 |
| | North Las Vegas, Nevada 89030 |
| Attorney (name/address/phone): | Attorney (name/address/phone): |
| Peter Goldstein, Attorney at law | |
| 10161 Park Run Drive Suite 150, Las Vegas, NV 89145 | |
| (702) 474-6400 | |

## II. Nature of Controversy *(please select the one most applicable filing type below)*

### Civil Case Filing Types

| Real Property | Torts | |
|---|---|---|
| **Landlord/Tenant** | **Negligence** | **Other Torts** |
| ☐ Unlawful Detainer | ☐ Auto | ☐ Product Liability |
| ☐ Other Landlord/Tenant | ☐ Premises Liability | ☑ Intentional Misconduct |
| **Title to Property** | ☐ Other Negligence | ☐ Employment Tort |
| ☐ Judicial Foreclosure | **Malpractice** | ☐ Insurance Tort |
| ☐ Other Title to Property | ☐ Medical/Dental | ☐ Other Tort |
| **Other Real Property** | ☐ Legal | |
| ☐ Condemnation/Eminent Domain | ☐ Accounting | |
| ☐ Other Real Property | ☐ Other Malpractice | |

| Probate | Construction Defect & Contract | Judicial Review/Appeal |
|---|---|---|
| **Probate** *(select case type and estate value)* | **Construction Defect** | **Judicial Review** |
| ☐ Summary Administration | ☐ Chapter 40 | ☐ Foreclosure Mediation Case |
| ☐ General Administration | ☐ Other Construction Defect | ☐ Petition to Seal Records |
| ☐ Special Administration | **Contract Case** | ☐ Mental Competency |
| ☐ Set Aside | ☐ Uniform Commercial Code | **Nevada State Agency Appeal** |
| ☐ Trust/Conservatorship | ☐ Building and Construction | ☐ Department of Motor Vehicle |
| ☐ Other Probate | ☐ Insurance Carrier | ☐ Worker's Compensation |
| **Estate Value** | ☐ Commercial Instrument | ☐ Other Nevada State Agency |
| ☐ Over $200,000 | ☐ Collection of Accounts | **Appeal Other** |
| ☐ Between $100,000 and $200,000 | ☐ Employment Contract | ☐ Appeal from Lower Court |
| ☐ Under $100,000 or Unknown | ☐ Other Contract | ☐ Other Judicial Review/Appeal |
| ☐ Under $2,500 | | |

| Civil Writ | | Other Civil Filing | |
|---|---|---|---|
| **Civil Writ** | | **Other Civil Filing** | |
| ☐ Writ of Habeas Corpus | ☐ Writ of Prohibition | ☐ Compromise of Minor's Claim | |
| ☐ Writ of Mandamus | ☐ Other Civil Writ | ☐ Foreign Judgment | |
| ☐ Writ of Quo Warrant | | ☐ Other Civil Matters | |

*Business Court filings should be filed using the Business Court civil coversheet.*

May 15, 2025
_____
Date

_____
Signature of initiating party or representative

*See other side for family-related case filings.*

Nevada AOC - Research Statistics Unit
Pursuant to NRS 3.275

Form PA 201
Rev 3.1

PETER GOLDSTEIN, ESQ.
Nevada Bar No. 6992
**PETER GOLDSTEIN LAW CORP**
10161 Park Run Drive, Suite 150
Las Vegas, Nevada 89145
Telephone: (702) 474-6400
Facsimile: (888) 400-8799
peter@petergoldsteinlaw.com

*Attorney for Plaintiffs*
*ANGELINA CAMARILLO, Individually*
*and as Co-Special Administrator with ROLLY*
*ENRIQUEZ of estate of FELICIA GUZMAN*

## DISTRICT COURT

## CLARK COUNTY, NEVADA

| | |
|---|---|
| ANGELINA CAMARILLO, individually and as Co-Special Administrator with Rolly ENRIQUEZ of the Estate of Decedent, FELICIA GUZMAN<br><br>                    Plaintiffs,<br><br>        vs.<br><br>CITY OF NORTH LAS VEGAS; BECKY SALKOFF; CAITLYN EBERT; and DOES 1-20, inclusive,<br><br>                    Defendants. | CASE NO.:<br>DEPT. NO.:<br><br>**PLAINTIFFS' COMPLAINT AND DEMAND FOR JURY TRIAL**<br><br>**Exhibit "A" Order Appointing Special Administrators**<br><br>**Exhibit "B" Redacted Death Certificate**<br><br>1.  **Unreasonable Search and Seizure—Excessive Force in violation of Article 1, § 8 (2) & Article 18 of the Nevada Constitution**<br>2.  **Battery (Wrongful Death)**<br>3.  **Negligence (Wrongful Death)**<br>4.  **Americans with Disability Act Violation** |

Plaintiffs, ANGELINA CAMARILLO, individually, and ROLLY ENRIQUEZ, as Co-Special Administrators of the ESTATE OF FELICIA GUZMAN, by and through their attorneys of record, PETER GOLDSTEIN, ESQ. of PETER GOLDSTEIN LAW CORP, hereby complain and allege against Defendants, and each of them, as follows:

### I.

### PARTIES AND JURISDICTION

1.      At all relevant times, Decedent FELICIA GUZMAN ("DECEDENT" or "GUZMAN") was an individual residing in North Las Vegas, Nevada.

2.    DECEDENT is survived by her biological daughter, Plaintiff ANGELINA CAMARILLO ("CAMARILLO").

3.    DECEDENT is also survived by her biological mother, Linda Guzman, who resides in Sacramento, California.

4.    At all times herein relevant, CAMARILLO resided in California.

5.    CAMARILLO sues in her individual capacity as daughter of DECEDENT and in a representative capacity as Co-Special Administrator of the Estate of Felicia Guzman. See Exhibit "B", Order Appointing Co-Special Administrators of FELICIA GUZMAN, attached hereto, and incorporated herein by this reference. Plaintiffs seek all damages available under NRS 41.100.

6.    At all times herein relevant, ROLLY ENRIQUEZ ("ENRIQUEZ") resides in Clark County, Nevada.

7.    ENRIQUEZ sues in a representative capacity as co-special administrator of DECEDENT's Estate.

8.    Plaintiff CAMARILLO seek both survival and wrongful death damages under Nevada state law while Plaintiff ENRIQUEZ is a co-administrator joining CAMARILLO for survival damages under Nevada state law.

9.    At all times herein mentioned, Defendant CITY OF NORTH LAS VEGAS (hereinafter "CNLV") is and was at all relevant times mentioned herein, a municipality duly organized and existing under the laws of the State of Nevada. It is a local government unit responsible for the area within its designated boundaries and employs, controls and supervises North Las Vegas Police Department ("NLVPD").

10.    At all relevant times, NLVPD was the employer of Defendants BECKY SALKOFF ("SALKOFF"), CAITLYN EBERT ("EBERT") and DOES 1-10, ("DOE OFFICERS") who were NLVPD Police Officers, and DOES 11 through 20 ("DOE SUPERVISORS") who were managerial, supervisorial, and policymaking employees of the NLVPD.

11.     SALKOFF, EBERT and DOE OFFICERS are sued in their individual capacity for damages only.

12.     At all times herein mentioned, CNLV employed, controlled, and operated the NLVPD, its police officers, and are liable for the actions and/or inactions of its police officers and DOES 11-20

13.     At all relevant times, Defendants SALKOFF, EBERT and DOES 1-10 were duly authorized employees and agents of NLVPD, who were acting under color of law within the course and scope of their respective duties as police officers and with the complete authority and ratification of their principal, Defendant CNLV.

14.     At all relevant times, Defendants SALKOFF, EBERT and DOES 1-20 were duly appointed officers and/or employees or agents of NLVPD, subject to oversight and supervision by NLVPD's elected and non-elected officials.

15.     In doing the acts and failing and omitting to act as hereinafter described Defendants SALKOFF and EBERT and DOES 1-20 were acting with the implied and actual permission and consent of CNLV.

16.     At all times mentioned herein, every CNLV defendant was the agent of each and every other CNLV defendant and had the legal duty to oversee and supervise the hiring, conduct, and employment of each and every CNLV Defendant.

17.     The true names of Defendants DOES 1 through 20, inclusive, are unknown to Plaintiffs, who therefore sue these defendants by such fictitious names.

18.     DOES 1 and 2 are designated by fictious names as they were present at the scene yet failed to do anything and were therefore integral participants and also failed to intervene.

19.     The Plaintiffs will seek leave to amend this complaint to show the true names and capacities of these defendants when they have been ascertained.

20.     Plaintiff is informed and believes and thereon alleges that, at all times herein relevant, each of the Defendants, was a principal, master, employer, co-conspirator, joint venturer and successor in interest of every other defendant, and every defendant was acting within the scope of said agency authority, employment, conspiracy, joint venture and succession of interest.

21.     Each of the fictitiously named defendants DOES 1 though 20 is responsible in some manner for the conduct and liabilities alleged herein.

## II.
## STATEMENT OF FACTS

22.     Upon information and belief, on May 16, 2023, at approximately 5:00 pm, NLVPD was contacted via the 911 system about GUZMAN.  She was reported to have charged at her roommate with a knife in a group home they both resided in at 1414 Basin Brook Dr., North Las Vegas, Nevada.

23.     Upon information and belief, GUZMAN had records of previous arrests and Legal 2000's.

24.     Despite knowledge of her mental health crisis, and possession of a knife, the dispatch officer(s) (i.e., DOES 11-20) designated the call as a 433 (Stolen property), rather than a 413A (Person with a knife).

25.     Upon information and belief, the dispatch call went out at 5:09 pm and SALKOFF and EBERT assigned themselves to the call.

26.     Upon information and belief, SALKOFF arrived first at around 5:12 pm and EBERT shortly followed.

27.     SALKOFF and EBERT then made contact with a man, later discovered to be Neil McGimpsey ("Neil"), outside the residence at 1414 Basin Brook Dr. North Las Vegas.  Neil was purportedly the owner of the residence, but it is unclear if he was in the house when the assault occurred.

28.     Plaintiffs allege based on information belief that SALKOFF and EBERT had made contact with the victim of the alleged stabbing as well as another witness who was inside the house

prior to their contact with Neil. Plaintiffs allege that SALKOFF and EBERT were aware of the allegations against Guzman and had been briefed by those witnesses about the violence that she allegedly committed.

29.    SALKOFF and EBERT lackadaisically spoke to Neil and interviewed him in front of the house where GUZMAN could see them, even though SALKOFF and EBERT had the information that GUZMAN was inside and armed with a knife. SALKOFF and EBERT did not direct Neil to move away from the house near a patrol car to keep him safe from GUZMAN, who they were informed had previously attacked a resident with a kitchen knife.

30.    SALKOFF and EBERT showed absolutely no regard for the safety of the Neil or the use proper police tactics from the beginning of their arrival to their fatal shooting of GUZMAN.

31.    SALKOFF and EBERT were aware of the dispatch call involving a serious event involving a person that was violent with a weapon.  They failed to immediately address and utilize tactics to keep the public safe from danger. SALKOFF and EBERT failed to relocate Neil away from the house to interview him to prevent him from being caught in crossfire (which he was) or to facilitate their apprehending Guzman.  Properly trained police officers would not have interviewed a witness in front of a residence in which they were aware that there was a person who allegedly committed a violent crime with a weapon and was still inside the house; SALKOFF and EBERT did not exhibit any concern of the gravity of the situation, nor did they communicate with each other and devise a tactical plan.

32.    Eventually, a clearly agitated GUZMAN came out of the house with a knife in hand, after seeing the officers and Neil talking in front of the house. GUZMAN was clearly mentally distressed and not in a rational mindset.

33.    SALKOFF and EBERT responded to GUZMAN by asking her to sit down in a chair and to put down the knife while simultaneously drawing their weapons, without regard for the people around or for less lethal force options.

34.    GUZMAN was obviously having a mental crisis, as she was diagnosed with multiple mental health disorders and was unable to hear and/or comprehend commands based on the limited bodycam publicly available.

35.     SALKOFF and EBERT repeatedly yelled at GUZMAN with their weapons drawn, while DECEDENT was obviously in crisis, paranoid, and clearly non-compliant.

36.     Upon information and belief, GUZMAN walked towards SALKOFF and EBERT, who were able to back up and use patrol cars as cover.  These officers had time, cover, and distance from GUZMAN before they improperly fired out of shear desperation, as the result of their having no tactics, no planning, and no communication.

37.     SALKOFF and EBERT failed to articulate any form of warning that they would shoot their weapons if GUZMAN did not comply with their orders.  Instead, they just shot GUZMAN multiple times.

38.     SALKOFF and EBERT shot GUZMAN with six (6) lethal rounds, and she was struck by four (4).  The shots were fatal, killing GUZMAN.

39.     SALKOFF's and EBERT's use of lethal force - which killed GUZMAN - was unnecessary, unreasonable, and unlawful.

40.     Upon information and belief, SALKOFF and EBERT knew or should have known that GUZMAN was armed with a knife, so it was improper and deficient that SALKOFF and EBERT were surprised or taken aback when they saw GUZMAN with a knife in hand.

41.     Upon information and belief, SALKOFF and EBERT knew or should have known that GUZMAN had mental health issues by virtue of the previous legal 2000s, by the dispatch and by Neil and other witnesses.

42.     SALKOFF and EBERT did not preplan their approach even after they received information that GUZMAN had a knife and allegedly injured someone.

43.     SALKOFF and EBERT made no effort to peacefully resolve GUZMAN's mental health crisis by first establishing a rapport with her leading to them repeatedly screaming at her.

44.     SALKOFF and EBERT did not attempt to de-escalate the situation even if it was apparent that GUZMAN was having a mental crisis.

45.     SALKOFF and EBERT did not attempt to deploy any less lethal options despite having the means to do so.  They were equipped with many tools in their duty belts and in their

vehicles that they could have utilized, such as tasers and less lethal shotguns. Also, they could have called for back-up or a K9 unit to be deployed.

46.    Upon information and belief, SALKOFF and EBERT did not attempt to request a Crisis Intervention Team.

47.    SALKOFF and EBERT knew or should have known that GUZMAN could not hear, comprehend or comply their commands and was not responsive, because among other things, she was suffering from a mental health crisis.

48.    Prior to and upon their arrival, before making contact with GUZMAN, SALKOFF and EBERT did not preplan or communicate a tactical plan on how to approach GUZMAN, they did not discuss the use of less lethal options or provide sufficient time to coordinate de-escalation, as well as failing to establish a rapport with her (these are basic police tactics that they seemed oblivious about).

49.    SALKOFF and EBERT failed to establish or develop rapport with GUZMAN in order to try to de-escalate the situation. Instead, they completely ignored her while she was in the house by talking casually and lackadaisically with Neil in the front yard where GUZMAN could see them.

50.    As GUZMAN exited the house right before she was shot, GUZMAN did not pose a threat to any member of the public. GUZMAN was not in a position where she was approaching another residence or other persons who might be potentially exposed to danger. There was no risk that GUZMAN was a threat to anyone other than potentially SALKOFF and EBERT whose approach was not within policy.

51.    SALKOFF and EBERT should never have positioned themselves within striking distance of the subject coming out of the house armed with a knife. They failed to create and maintain sufficient distance. SALKOFF was specifically positioned next to the garage door which was especially concerning given that if she fired then Neil could have been struck by crossfire.

52.    Upon information and belief, SALKOFF and EBERT did not attempt to gather additional resources, or use less lethal weapons, such as a 40-mm ballistic foam launcher, less lethal shotguns, tasers, K-9 team, crisis negotiators, or other tools.

53.     This is especially concerning because NLVPD has had numerous instances of shooting persons in crisis who are holding sharp edged objects and failing to develop tactical plans to assess and attempt to diffuse the situations without the use of lethal force.

54.     GUZMAN proceeded to walk toward the SALKOFF and EBERT in apparent distress and clearly unable to hear, comprehend or comply with their commands.

55.     Upon information and belief, SALKOFF and EBERT shot and killed GUZMAN because of their deficient acts and omissions, including (without limitation) that they failed to employ proper police tactics, and they failed to plan their course of action in light of the possibility that GUZMAN may come out of the home with the weapon that they knew she was armed with.

56.     At the time of the shooting, SALKOFF was forty years old and was working as a sergeant for NLVPD.

57.     At the time of the shooting, EBERT was twenty-nine years old and was working as an officer for NLVPD.

58.     For all the reasons mentioned above and all the failures to follow policy, SALKOFF and EBERT violated Article 1, § 18 of the Nevada Constitution guaranteeing the right to be free from unreasonable searches and seizures, which mirror the protections of the Fourth Amendment of the U.S. Constitution.

59.     Upon information and belief, SALKOFF and EBERT failed to immediately render medical assistance, even though they are equipped with tourniquets, they failed to use them to stop the bleeding.

60.     GUZMAN sustained multiple gunshot wounds which were the cause of her death as evidenced in her death certificate. Some of her gunshot wounds were to the back of her body which was fired after she was already disabled and in a defensive posture.  Her death was ruled a homicide.

61.     SALKOFF and EBERT's approach, implementation of preplanning (or lack thereof), failure to de-escalate, preclusion and deficient threat assessment were not within Departmental training, tactics, and policy. Among other things, SALKOFF and EBERT failed to communicate and coordinate a response, slow the momentum, and gather resources.

62.     SALKOFF and EBERT were aware of and yet failed to abide by fundamental principles of officer-citizen contacts – including de-escalation, slowing the momentum, utilizing cover, and making use of the availability of other officers and resources.   This is especially improper, given that there were at least one or two other NLVPD officers present who failed to do anything (DOES 1 and 2).

63.     SALKOFF and EBERT's lack of adequate preplanning was not in accordance with tactics, training and policy.   SALKOFF's and EBERT's supposed preplanning was that they would find the subject and expect the subject to comply with their commands.   Defendants did not coordinate a response in the event that GUZMAN did not comply. They did not follow their training by planning or gathering the use of less lethal options we were both equipped with tasers.

64.     SALKOFF and EBERT arrived at around 5:12PM at the residence and the fatal shooting occurred at 5:23 PM.   They were there approximately 11 minutes during which they never communicated, developed a tactical plan, or established a rapport with GUZMAN.

65.     SALKOFF and EBERT failed to move Neil into safety, when they were aware that GUZMAN was inside the house with a knife and was mentally unstable.   SALKOFF and EBERT risked the life of Neil by allowing him to stay in close proximity with GUZMAN who had a knife. By unnecessarily chatting with Neil in front of the house where GUZMAN could see them, SALKOFF and EBERT likely caused GUZMAN to become more aggravated and agitated.

66.     There was no urgency because GUZMAN was alone in the house and she was not at risk of hurting anyone inside; i.e., there was no need for SALKOFF and EBERT to rush to take immediate action without proper preplanning, communication, and deliberation.   SALKOFF and EBERT knew that GUZMAN was in possession of a knife and that she had mental health issues; yet SALKOFF and EBERT failed to slow the momentum or de-escalate the situation.   Instead, they aggravated it by poor planning, reckless disregard for the welfare of GUZMAN and Neil. They also failed to use DOES 1 and 2, who failed on their own.

67.     Use of Force training provides for the use of cover, creation of time, creation of distance, to tactically reposition when necessary (among other things) in order to diffuse a tense police encounter. Instead, SALKOFF and EBERT drew their guns and shot at GUZMAN.

SALKOFF and EBERT failed to take action to de-escalate the situation or slow the momentum – other than twice shouting "drop the knife" just before firing.  (Shouting "drop the knife" does not constitute a warning as to what would occur if GUZMAN did not drop the knife.)  Meanwhile DOES 1 and 2 did nothing.

68.    Under Use of Force policies, the elements necessary to justify the use of deadly force include ability, opportunity, imminent jeopardy, and preclusion.  Two core POST guidelines, regarding use of force principles, are de-escalation and slowing the momentum.  SALKOFF and EBERT did not employ reasonable steps to de-escalate or slow the momentum. When they arrived at the scene, they were unorganized and used a hazardous approach to a high-risk encounter.

69.    In addition to SALKOFF and EBERT, the two other officers present during the incident, now designated as DOES 1 and 2 failed to participate in any way.

70.    The improper acts and omissions of SALKOFF and EBERT's resulted in imminent jeopardy and a lack of preclusion. SALKOFF and EBERT made serious errors that forced the situation.  SALKOFF and EBERT violated the Use of Force policies and did not follow their training.  Therefore, SALKOFF and EBERT's actions did not comply with departmental policies, procedures, and training. SALKOFF and EBERT's conduct involved multiple serious deviations – not mere technical deviations – from policy, tactics, and training leading to the death of Guzman.

71.    As a result of the foregoing, GUZMAN suffered intense physical and emotional pain, anguish, distress and despair, and pre-death pain and suffering, including the loss of enjoyment of life and loss of familial relations.

72.    SALKOFF and EBERT and DOES 1-10, are responsible for the GUZMAN's injuries and death either because they were personally involved or because they were integral participants or because they failed to intervene.

### III.
### FIRST CLAIM FOR RELIEF
**EXCESSIVE FORCE - (Nev. Cons. art. 1, § 18)**
**(SPECIAL ADMINISTRATORS v. SALKOFF and EBERT, DOES 1 and 2)**

73.     Plaintiffs repeat, reallege, and incorporates herein by this reference, each and every allegation above as though fully set forth herein.

74.     Article 1, section 18 of the Nevada Constitutions requires the degree of force used by an officer to be objectively reasonable under the circumstances. Whether an officer's particular use of force was reasonable is judged from the perspective of a reasonable officer at the scene.

75.     To determine the perspective of a reasonable officer at the scene, a factfinder must consider the totality of the circumstances, including, but not limited to, the nature of the crime or other circumstances known to the officer, whether the plaintiff posed an immediate threat to the officer or others, the relationship between the need to use force and the amount or degree of force used, whether the officer made efforts to limit the amount of force used, and the availability of alternative methods that police officers can utilize to accomplish legitimate law enforcement objectives.

76.     SALKOFF and EBERT shot at GUZMAN six (6) times and striking her with four (4) bullets causing her death.

77.     Despite knowledge of her possession of a knife, SALKOFF and EBERT failed to preplan their course of action on how to deal with GUZMAN considering the circumstances.

78.     SALKOFF and EBERT were clearly caught off guard when GUZMAN exited the house. This is particularly troubling in light of the fact that they knew she had a knife, they knew she had allegedly injured someone and that she was alone in the house. That is the result of the lack of planning and communication which resulted in them being backed into a corner.

79.     SALKOFF did not even remotely consider the possibility that GUZMAN might come out with the knife, by how she positioned herself in the situation. She was in a position in which if she had to fire her weapon, Neil would be in the line of fire.

80.     SALKOFF and EBERT immediately drew their weapons at the sight of GUZMAN with a knife in her hand and repeatedly screamed at her despite the fact that she was obviously in crisis, paranoid, and unable to hear, comprehend or comply with commands.

81.     Despite the many opportunities they had to create cover and maintain distance from GUZMAN, and despite the availability of less lethal options, SALKOFF and EBERT made the conscious decision to use deadly force.

82.     The unjustified use of excessive force against GUZMAN by SALKOFF and EBERT, including, but not limited to, shooting GUZMAN four times – which proved fatal to GUZMAN – deprived GUZMAN of her right to be secure in her person against unreasonable and excessive force as guaranteed to GUZMAN pursuant to violated Article I, § 8 and Article 18 of the Nevada Constitution.

83.     As a result of SALKOFF and EBERT's and DOE 1's and DOE 2's actions and omissions, as well as their failure to properly respond to the situation, utilize less lethal means, and utilize the other officers that were present for backup, GUZMAN was shot and killed.

84.     The conduct of SALKOFF and EBERT was willful, wanton, malicious, and done with reckless disregard for the rights and safety of GUZMAN and therefore warrants the imposition of exemplary and punitive damages as to SALKOFF and EBERT.

85.     The Co-Special Administrators of the Estate of GUZMAN also seek statutory attorney fees and costs under this claim.

## IV.
## SECOND CLAIM FOR RELIEF
### BATTERY – WRONGFUL DEATH (Nevada State Law Claim)
### (SPECIAL ADMINISTRATORS and CARILLO v. ALL DEFENDANTS)

86.     Plaintiffs repeat, reallege, and incorporate herein by this reference, each and every allegation above as though fully set forth herein.

87.     SALKOFF and EBERT and DOES 1-10, while working as Police officers for NLVPD, and acting within the course and scope of their duties, used unreasonable force when they intentionally shot GUZMAN.

88.     Defendants SALKOFF and EBERT intentionally shot GUZMAN multiple times, at close range, and used unwarranted excessive and deadly force. GUZMAN did not consent to be shot multiple times.

89.     As a result of the actions of SALKOFF and EBERT, and DOES 1-10, GUZMAN suffered severe pain and suffering and ultimately died from her injuries and lost any potential earning capacity. SALKOFF and EBERT and DOES 1-10 had no legal justification for using said force, including deadly force, against GUZMAN, while carrying out their official duties.

90.     As a direct and proximate result of the SALKOFF and EBERT's conduct as alleged above, GUZMAN died and has left her daughter, CAMARILLO, to suffer extreme and severe mental anguish and pain. CAMARILLO has been deprived of the life-long love, companionship, comfort, non-economic support, society, care, and sustenance of GUZMAN, and will continue to be so deprived of her natural life. CAMARILLO and Co-Special Administrators are also claiming funeral and burial expenses.

91.     Defendant CNLV, by and through NLVPD, is vicariously liable for the wrongful acts of SALKOFF and EBERT and DOES 1-10 because they were acting under color of law and within the course and scope of their employment as police officers for NLVPD.

92.     The conduct of SALKOFF and EBERT were malicious, wanton, oppressive, and accomplished with a conscious disregard for the rights of Plaintiffs and GUZMAN, entitling Plaintiffs to an award of exemplary and punitive damages against SALKOFF and EBERT.

93.     Plaintiffs seek all permissible wrongful death damages under Nev. Rev. Stat. §41.085, including, but not limited to, damages for their grief, sorrow, loss of probable non-economic support, companionship, society, comfort and consortium, and damages for pain, suffering of GUZMAN, and any penalties, including, but not limited to, exemplary and punitive damages.

94.     Plaintiffs also seek statutory attorney fees and costs under this claim.

## V.

### THIRD CLAIM FOR RELIEF

### NEGLIGENCE – WRONGFUL DEATH (Nevada State Law Claim)

### (SPECIAL ADMINISTRATORS v. ALL DEFENDANTS)

95.     Plaintiffs repeat, reallege, and incorporates herein by this reference, each and every allegation above as though fully set forth herein.

96.    The actions and inactions of the Defendants were negligent and reckless, as described below:

a. The failure to properly code the dispatch call as 433 (Stolen property), rather than a 413A (Person with a knife) based on the information from the 911 call.

b. The failure to dispatch an adequate number of officers to respond to the call in violation of NLVPD policy and procedure;

c. The failure to preplan and coordinate their approach to the call, given the circumstances;

d. The failure to move Neil to safety and to aggravate the situation by talking to Neil where GUZMAN could see them;

e. The failure of SALKOFF and EBERT to utilize supporting officers who were already at the scene to deal with a person with mental illness, contrary to CNLV's policies and procedures;

f. The failure to properly and adequately assess the need to use deadly force against GUZMAN;

g. The failure of SALKOFF and EBERT to communicate with each other and DOES 1 and 2;

h. The failure of SALKOFF and EBERT to develop a rapport with GUZMAN or even show any concern for her while she was inside the house;

i. The negligent tactics with GUZMAN, including the use of excessive force in shooting of GUZMAN and pre-shooting negligence and the failure to allow GUZMAN time to comply with their commands.

j. The failure to de-escalate the situation to prevent OIS;

k. The failure to use less intrusive means available;

l. The failure to use special caution when arrestee shows signs of mental instability;

m. The failure to provide adequate verbal warnings and commands and not providing GUZMAN an opportunity to comply.

n. The failure to provide warnings before deadly force was used;

o. The negligent use of deadly force against GUZMAN;

14

p. The negligent failures to employ tactics;

q. The failure to provide prompt medical care to GUZMAN;

r. The failure to properly train and supervise employees, including SALKOFF and EBERT and DOES 1-10;

s. The failure to ensure that adequate numbers of employees with appropriate education and training were available to meet the needs of and protect the rights of GUZMAN;

t. The negligent handling of report writing, evidence and witnesses; For example, the time-line in the reports is internally inconsistent and metaphysically impossible.

u. The failure to investigate into the conduct of SALKOFF and EBERT and DOES 1-10 and the events relating to the shooting of GUZMAN and/or failure of NLVPD to conduct a prompt and thorough investigation into the actions/inactions of SALKOFF and EBERT and DOES 1-10;

v. The failure to do anything or take any action with respect to the shooting of GUZMAN, resulting in de facto ratification;

w. The failure to follow proper protocol in investigating this OIS and conducting thorough, unbiased interviews;

x. Violating NLVPD's policy regarding the use of excessive force specifically that applies to individuals suffering from mental crises.

y. Violating NLVPD's policy regarding the use of deadly force;

97.    As a direct and proximate result of the Defendants' conduct as alleged above, and other undiscovered negligent conduct, GUZMAN was caused to suffer severe pain and suffering and ultimately died and lost earning capacity.

98.    As a direct and proximate result of Defendants' conduct as alleged above, Plaintiffs suffered extreme and severe mental anguish and pain and have been injured in mind and body. CAMARILLO have been deprived of the life-long love, companionship, comfort, support, society, care, and sustenance of GUZMAN and will continue to be so deprived for the remainder of her natural life.

99.    The CO-SPECIAL ADMINISTRATORS of DECEDENT's estate are also claiming, *inter alia*, funeral, and burial expenses.

100.    NLVPD is vicariously liable for the wrongful acts of SALKOFF and EBERT and DOES 1-20 because they acted under the color of law and within the course and scope of their employment as police officers for the NLVPD.

101.    Upon information and belief, the negligent acts of SALKOFF and EBERT, and DOES 1-20, which resulted in bodily harm, including death to GUZMAN were vicariously condoned by NLVPD.

102.    The individual Plaintiffs seek all permissible damages under Nev. Rev. Stat. §41.085, including, but not limited to, damages for their grief, sorrow, loss of probable support, companionship, society, comfort and consortium, and damages for pain, suffering of the GUZMAN, any penalties, including, but not limited to, exemplary and punitive damages.

103.    CAMARILLO also seek statutory attorney fees and costs under this claim.

## VI.

### FOURTH CLAIM FOR RELIEF
### AMERICANS WITH DISABILITIES ACT- 42 USC. § 12131
### And REHABILITATION ACT 29 USC. § 794
### (SPECIAL ADMINISTRATORS v. CNLV)

104.    Plaintiffs repeat, reallege, and incorporates herein by this reference, each and every allegation above as though fully set forth herein.

105.    Upon information and belief, CNLV by and through NLVPD,  receives federal funding.

106.    Upon information and belief, GUZMAN suffered from a mental disability.

107.    Upon information and belief, CNLV by and through NLVPD, knew or should have known that GUZMAN suffered from mental disability based on her behavior.

108.    CNLV by and through NLVPD, had an obligation under the Americans with Disabilities Act and the Rehabilitation Act (ADA) to accomodate GUZMAN's disability when attempting to effectuate her deten

109.    Upon information and belief, CNLV by and through NLVPD, did not modify their tactics to account for GUZMAN's disability and in doing so both failed to reasonably accommodate her disability and discriminated against her based on her disability.

110.    Upon information and belief, CNLV by and through NLVPD, does not instruct their officers to modify their tactics to effectuate arrest that reasonably accomodates disabilities when dealing with individuals with mental disabilities and by failing to do so discriminated against GUZMAN based on her disability.

111.    The ADA was enacted "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities" and "to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1) & (2).

112.    Title II of the ADA provides: No qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity. *Id.* § 12132. Discrimination includes a failure to reasonably accommodate a person's disability. To be a qualified individual with a disability, a person must suffer from a physical or mental impairment that substantially limits that person's ability to perform a major life activity — an activity that the average person in the general population can perform.

113.    Title II of the ADA includes an affirmative obligation that public entities must make accommodations for people with disabilities.

114.    Title II of the ADA mandates a public entity may be liable for damages under Title II of the ADA if it intentionally or with deliberate indifference fails to provide a reasonable accommodation to a disabled person. The failure to provide reasonable accommodation constitutes discrimination against the disabled person. A public entity may not disregard the plight and distress of a disabled person by failing to accommodate his or her needs.

115.    Title II of the ADA mandates that once an entity is on notice of the need for accommodation, it is required to undertake a fact-specific investigation to determine what constitutes a reasonable accommodation.

116.    Title II of the ADA applies to CNLV by and through NLVPD, because it is a public entity.

117.    Title II of the ADA applies to police departments.

118.    Title II of the ADA requires CNLV by and through NLVPD, to train its officers in how to deal with physically and mentally disabled individuals.

119.    Title II of the ADA mandates that government agencies, including police officers, must take a disabled person's disability into account by making reasonable modifications of policies and practices where needed to avoid discrimination. 42 U.S.C. Section 12132, 28 C.F.R. Section 35.130(b)(7).

120.    GUZMAN's form of mental illness is a recognized impairment for purposes of the ADA.

121.    GUZMAN was disabled under the ADA because her mental illness substantially limited her ability to communicate, to interact with others, and to care for himself.

122.    CNLV by and through NLVPD, knew or should have known GUZMAN was experiencing a severe mental health crisis. These Defendants should have known how to accommodate her mental illness by employing de-escalation strategies with the intent of achieving a safe and nonviolent self-surrender. Yet despite this knowledge, and the national mandate to accommodate the disabled, these Defendants chose to not to accommodate GUZMAN impairment and chose to apply tactics that made a safe and nonviolent self-surrender impossible.

123.    CNLV by and through NLVPD, utilized techniques nationally understood to exacerbate and intensify stress and apprehension in the mentally ill. Such practices have long been rejected by police departments when interacting with persons suffering mental impairment. Such

practices render it impossible for mentally ill persons to understand and/or to comply with directives and commands and are guaranteed to make a safe and peaceful self-surrender impossible.

124.    CNLV by and through NLVPD, could have reasonably accommodated GUZMAN by preplanning and coordinating with each other on how to approach, using nonlethal beanbag measures, and using the passage of time to defuse the situation peacefully rather than encouraging an deadly confrontation.

125.    CNLV by and through NLVPD, had the time, safety and opportunity to assess the situation and administer a strategy to appropriately accommodate GUZMAN because she was alone inside the house, she maintained significant proximity from Defendants, and Defendants were positioned for safe retreat.

126.    At all times, CNLV by and through NLVPD, could have accommodated GUZMAN by not aggravating the situation when they were hanging out in front of the house and chatting with GUZMAN's roommate. Even when an emotionally disturbed individual is acting out and inviting officers to use force to subdue him, the government interest in using such force is diminished by the fact that the officers are confronted, not with a person who has committed a serious crime against others, but with a mentally ill person who needs and requires accommodation for his disability.

127.    At all times, CNLV by and through NLVPD, knew or should have known that GUZMAN had a knife and that she was mentally distressed and because of her impairment, they were required to exert greater effort and caution to take control of the situation through less intrusive means.

128.    By failing to accommodate GUZMAN's mental health disability, Defendants acted with discriminatory intent and deliberate indifference to her protected rights.

129.    The conduct alleged herein was done in reckless disregard of GUZMAN's protected rights.

130. By reason of the aforementioned acts and omissions of Defendants and each of them, Plaintiff has suffered loss of love, companionship, affection, comfort, care, and society due to the death of GUZMAN.

131. Accordingly, Defendants and each of them are liable to Plaintiff for compensatory damages in an amount according to proof at trial.

132. Plaintiff also seeks statutory attorney fees under this claim.

133. CNLV by and through NLVPD, is vicariously liable to Plaintiff for damages for the foregoing acts of SALKOFF and EBERT and the emotional distress negligently inflicted upon Plaintiff because they were acting under color of law, employed by CNLV by and through NLVPD and within the course and scope of their employment as police officers for the NLVPD.

134. As a direct and proximate result of Defendants' conduct as alleged above, Plaintiff suffered extreme and severe mental, emotional anguish, distress, and pain for the death of her mother.

135. Plaintiff is therefore entitled to damages for her mental and/or emotional distress as a result of the conduct of SALKOFF and EBERT above mentioned.

136. Plaintiff also seeks attorney's fees and costs.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, ANGELINA CAMARILLO, Individually and as Co-Special Administrator with ROLLY ENRIQUEZ of the estate of FELICIA GUZMAN, through their attorney, request entry of judgment in their favor and against Defendants as follows:

A. For compensatory damages, including both survival damages and wrongful death damages under state law, in an amount to be proven at trial;

B. For general and hedonic damages;

C. For funeral and burial expenses;

D. For medical billing and expense;

1    E.    For punitive damages against SALKOFF and EBERT in an amount to be

2    proven in trial;

3    F.    For interest;

4    G.    For reasonable costs of this action, court costs, and attorneys' fees; and

5    H.    For such other and further relief as the Court may deem just, proper, and

6    appropriate.

7

8    DATED: May 15, 2025                    PETER GOLDSTEIN LAW CORP

9

10

11                                         By:  /s/ Peter Goldstein
                                           PETER GOLDSTEIN, ESQ.
12                                         *Attorney for Plaintiffs*
                                           *ANGELINA CAMARILLO, Individually*
                                           *and as Co-Special Administrator with ROLLY*
13                                         *ENRIQUEZ of estate of FELICIA GUZMAN*

14

15

16

17                           **<u>DEMAND FOR JURY TRIAL</u>**

18        Plaintiffs, by and through their attorneys of record, hereby demand a jury trial of all of the

19   issues in the above matter.

20

21   DATED: May 15, 2025

22                                         PETER GOLDSTEIN LAW CORP

23

24                                         By:  /s/ Peter Goldstein
                                           PETER GOLDSTEIN, ESQ.
25                                         *Attorney for Plaintiffs*
                                           *ANGELINA CAMARILLO, Individually*
26                                         *and as Co-Special Administrator with ROLLY*
                                           *ENRIQUEZ of estate of FELICIA GUZMAN*

27

28

21

# EXHIBIT A

## CERTIFICATION OF VITAL RECORD

### DEPARTMENT OF HEALTH AND HUMAN SERVICES
#### DIVISION OF PUBLIC AND BEHAVIORAL HEALTH
#### VITAL STATISTICS

**CASE FILE NO.** 4350151

### CERTIFICATE OF DEATH

**2023011612**
STATE FILE NUMBER

| TYPE OR PRINT IN PERMANENT BLACK INK | 1a. DECEASED-NAME (FIRST,MIDDLE,LAST,SUFFIX) Felicia Rena GUZMAN | 2. DATE OF DEATH (Mo/Day/Year) May 16, 2023 | 3a. COUNTY OF DEATH Clark |
|---|---|---|---|

**DECEDENT**

| 3b. CITY, TOWN, OR LOCATION OF DEATH Las Vegas | 3c. HOSPITAL OR OTHER INSTITUTION -Name(If not either, give street and number) University Medical Center | 3e.If Hosp. or Inst. indicate DOA,OP/Emer. Rm. Inpatient(Specify) Operating Room | 4. SEX Female |
|---|---|---|---|

| 5. RACE (Specify) White | 6. Hispanic Origin? Specify Yes - Mexican | 7a. AGE-Last birthday (Years) 43 | 7b. UNDER 1 YEAR MOS DAYS | 7c. UNDER 1 DAY HOURS MINS | 8. DATE OF BIRTH (Mo/Day/Yr) February 15, 1980 |
|---|---|---|---|---|---|

**IF DEATH OCCURRED IN INSTITUTION SEE HANDBOOK REGARDING COMPLETION OF RESIDENCE ITEMS**

| 9a. STATE OF BIRTH (If not US/CA, name country) California | 9b. CITIZEN OF WHAT COUNTRY United States | 10.EDUCATION 14 | 11. MARITAL STATUS (Specify) Never Married | 12. SURVIVING SPOUSE'S NAME (Last name prior to first marriage) |
|---|---|---|---|---|

| 13. SOCIAL SECURITY NUMBER | 14a. USUAL OCCUPATION (Give Kind of Work Done During Most of Life) OFFICE CLERK | 14b. KIND OF BUSINESS OR INDUSTRY MEDICAL | Ever in US Armed Forces? No |
|---|---|---|---|

| 15a. RESIDENCE - STATE Nevada | 15b. COUNTY Clark | 15c. CITY, TOWN OR LOCATION Las Vegas | 15d. STREET AND NUMBER 555 Green Gables Avenue | 15e. INSIDE CITY LIMITS (Specify Yes or No) Yes |
|---|---|---|---|---|

**PARENTS**

| 16. FATHER/PARENT - NAME (First Middle Last Suffix) Ricardo J GUZMAN | 17. MOTHER/PARENT - NAME (First Middle Last Suffix) Consuelo Linda RENTERIA |
|---|---|

| 18a. INFORMANT- NAME (Type or Print) Consuelo Linda GUZMAN | 18b. MAILING ADDRESS (Street or R.F.D. No, City or Town, State, Zip) 3536 Faberge Way Sacramento, California 95826 |
|---|---|

**DISPOSITION**

| 19a. BURIAL, CREMATION, REMOVAL, OTHER (Specify) Cremation | 19b. CEMETERY OR CREMATORY - NAME Paradise Valley Crematory | 19c. LOCATION City or Town State Las Vegas Nevada 89119 |
|---|---|---|

| 20a. FUNERAL DIRECTOR - SIGNATURE (Or Person Acting as Such) BILLY C VALLIE Jr SIGNATURE AUTHENTICATED | 20b. FUNERAL DIRECTOR LICENSE NUMBER FD918 | 20c. NAME AND ADDRESS OF FACILITY Davis Funeral Home and Memorial Park 6200 S Eastern Las Vegas NV 89119 |
|---|---|---|

**TRADE CALL**

| TRADE CALL - NAME AND ADDRESS |
|---|

**CERTIFIER**

| To Be Completed by CERTIFYING PHYSICIAN | 21a. To the best of my knowledge, death occurred at the time, date and place and due to the cause(s) stated.(Signature & Title) | To Be Completed by CORONER'S OFFICE | 22a. On the basis of examination and/or investigation, in my opinion death occurred at the time, date and place and due to the cause(s) stated. (Signature & Title) STEPHANIE YAGI DO SIGNATURE AUTHENTICATED |
|---|---|---|---|
| | 21b. DATE SIGNED (Mo/Day/Yr) | 21c. HOUR OF DEATH | | 22b. DATE SIGNED (Mo/Day/Yr) May 26, 2023 | 22c. HOUR OF DEATH 18:59 |
| | 21d. NAME OF ATTENDING PHYSICIAN IF OTHER THAN CERTIFIER (Type or Print) | | 22d. PRONOUNCED DEAD (Mo/Day/Yr) May 16, 2023 | 22e. PRONOUNCED DEAD AT (Hour) 18:59 |

| 23a. NAME AND ADDRESS OF CERTIFIER (PHYSICIAN, ATTENDING PHYSICIAN, MEDICAL EXAMINER, OR CORONER) (Type or Print) Stephanie Yagi DO 1704 Pinto Lane Las Vegas, NV 89106 | 23b. LICENSE NUMBER DO3172 |
|---|---|

**REGISTRAR**

| 24a. REGISTRAR (Signature) NANCY BARRY SIGNATURE AUTHENTICATED | 24b. DATE RECEIVED BY REGISTRAR (Mo/Day/Yr) May 26, 2023 | 24c. DEATH DUE TO COMMUNICABLE DISEASE YES ☐ NO ☒ |
|---|---|---|

**CAUSE OF DEATH**

**CONDITIONS IF ANY WHICH GAVE RISE TO IMMEDIATE CAUSE STATING THE UNDERLYING CAUSE LAST**

| 25. IMMEDIATE CAUSE (ENTER ONLY ONE CAUSE PER LINE FOR (a), (b), AND (c).) | Interval between onset and death |
|---|---|
| PART I (a) Multiple Gunshot Wounds | |
| DUE TO, OR AS A CONSEQUENCE OF: (b) | Interval between onset and death |
| DUE TO, OR AS A CONSEQUENCE OF: (c) | Interval between onset and death |
| DUE TO, OR AS A CONSEQUENCE OF: (d) | Interval between onset and death |

| PART II OTHER SIGNIFICANT CONDITIONS-Conditions contributing to death but not resulting in the underlying cause given in Part 1. | 26. AUTOPSY (Specify Yes or No) Yes | 27. WAS CASE REFERRED TO CORONER (Specify Yes or No) Yes |
|---|---|---|

| 28a. ACC., SUICIDE, HOM., UNDET. OR PENDING INVEST. (Specify) Homicide | 28b. DATE OF INJURY (Mo/Day/Yr) May 16, 2023 | 28c. HOUR OF INJURY 1633 | 28d. DESCRIBE HOW INJURY OCCURRED Shot By Other(s) |
|---|---|---|---|

| 28e. INJURY AT WORK (Specify Yes or No) No | 28f. PLACE OF INJURY - At home, farm, street, factory, office building, etc. (Specify) Outdoors/Non-Public | 28g. LOCATION 1414 Basin Brook Drive | STREET OR R.F.D. No. | CITY OR TOWN North Las Vegas | STATE Nevada |
|---|---|---|---|---|---|

"CERTIFIED TO BE A TRUE AND CORRECT COPY OF THE DOCUMENT ON FILE WITH THE REGISTRAR OF VITAL STATISTICS, STATE OF NEVADA." This copy was issued by the Southern Nevada Health District from State certified documents authorized by the State Board of Health pursuant to NRS 440.175.

**DATE ISSUED:** 6/1/2023

Registrar of Vital Statistics *SIGNATURE AUTHENTICATED*
By: *Susan Bannis*

This Copy not valid unless prepared on engraved border displaying date, seal and signature of Registrar.
SOUTHERN NEVADA HEALTH DISTRICT • P.O. Box 3902 • Las Vegas, NV 89127 • 702-759-1010 • Tax ID # 88-0151573



# EXHIBIT B

Electronically Filed
05/14/2025 3:46 PM

*[signature]*

CLERK OF THE COURT

**OASA**
Peter Goldstein, Esq., (SBN 6992)
**PETER GOLDSTEIN LAW CORP**
10161 Park Run Drive, Suite 150
Las Vegas Nevada, 89145
Telephone:  702-474-6400
Facsimile:   888-400-8799
peter@petergoldsteinlaw.com

*Attorney for Petitioner,*
*ANGELINA CAMARILLO and ROLLY ENRIQUEZ*

## JUDICIAL DISTRICT COURT

## CLARK COUNTY, NEVADA

| | |
|---|---|
| In the Matter of the Estate of<br>FELICIA RENA GUZMAN<br><br>Deceased, | P-24-121635-E Consolidated with<br>Case No.: P-25-125120-E<br>Dept. 26<br><br>~~PROPOSED~~ ORDER |

### ORDER APPOINTING SPECIAL ADMINISTRATOR AND FOR ISSUANCE OF

### SPECIAL LETTERS OF ADMINISTRATION

Upon submission of a verified *ex parte* petition for appointment of a special administrator and for issuance of special letters of administration representing as follows:

Felicia Rena Guzman ("Decedent") died intestate on May 16, 2023 in Clark County, Nevada.

1.      Decedent was a resident of Clark County, Nevada when she died.

2.      Petitioners have never been convicted of a felony.

**NOW THEREFORE IT IS HEREBY ORDERED** that Petitioners Angelina Camarillo and Rolly Enriquez are appointed as Special Co-Administrators of the Estate of Felicia Rena Guzman and that Special Letters of Administration be issued, without bond, to Petitioners Angelina Camarillo upon taking the oath of office, for the purpose of administering the estate in

1

1  accordance with Nevada Revised Statutes Chapter §140.040.

2      **IT IS FURTHER ORDERED** that all moneys received by this Estate will be placed in

3  the attorney's trust account until further ordered by the Court.

4      **IT IS FURTHER ORDERED** that the settlement of the Decedent's lawsuit is subject to

5  this Court's approval.

6

7  Dated this _____ day of ____, 2025.

Dated this 14th day of May, 2025

8

9  **C5F 4B4 82D9 7C41**
   **Gloria Sturman**
   **District Court Judge**

10

11                                          District Court Judge

12  Respectfully submitted,

13  By:_____

14      PETER GOLDSTEIN, ESQ. [SBN 6992]
        10161 Park Run Drive, Suite 150

15      Las Vegas, Nevada 89145
        *Attorney for Petitioners*

16      *Angelina Camarillo and Rolly Enriquez*

17

18

19

20

21

22

23

24

25

26

27

28

2